1

2

3

4

5

6

**SUPERIOR COURT OF WASHINGTON FOR KING COUNTY**

7

8

9

10

11

12

13

14

15

16

17

18

19

| | |
|---|---|
| THE SECOND AMENDMENT FOUNDATION; THE CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS; LIBERTY PARK PRESS; MERRIL MAIL MARKETING; CENTER FOR THE DEFENSE OF FREE ENTERPRISE; SERVICE BUREAU ASSOCIATION; and ALAN GOTTLIEB, | No. CIVIL RIGHTS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF |

                    Plaintiffs,

        v.

ROBERT FERGUSON, individually and in his official capacity as Washington Attorney General; JOSHUA STUDOR, individually and in his official capacity as Washington Assistant Attorney General, Consumer Protection Division; THE ATTORNEY GENERAL'S OFFICE FOR THE STATE OF WASHINGTON, and JOHN DOES 1-10,

                    Defendant.

20

21

## I.    INTRODUCTION

22

"If there is any fixed star in our constitutional constellation, it is that no official, high

23

or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other

24

matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia*

25

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1   *State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Our democratic system is built on

2   this foundational rule: every citizen may believe as her conscience dictates and advocate for

3   political change corresponding to those beliefs. "The right of citizens to inquire, to hear, to

4   speak, and to use information to reach consensus is a precondition to enlightened self-

5   government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310

6   (2010). This basic tenet sets the United States apart from repressive regimes in which the

7   powers of office are used to suppress opposition—official animosity to political speech

8   "offends the Constitution because it threatens to inhibit exercise of [these] protected right[s]."

9   *Crawford–El v. Britton*, 523 U.S. 574, 588, n. 10 (1998).

10      The people of Washington entrusted Washington Attorney General Bob Ferguson and

11   the attorneys beneath him with significant prosecutorial and investigatory powers so that they

12   could fairly enforce the laws enacted by the people's elected representatives. But Mr.

13   Ferguson and his colleagues have overreached. They have used their powers to target citizens

14   simply because they do not share Mr. Ferguson's personal beliefs. The Washington Supreme

15   Court recently reprimanded Mr. Ferguson for this practice when it held unanimously that his

16   office had improperly used the Washington Consumer Protection and Charitable Solicitations

17   Acts to suppress constitutionally protected speech with which he disagreed. But Mr. Ferguson

18   remained unrepentant, publicly stating *he is proud* that his improper investigation chilled the

19   exercise of constitutional rights.

20      Mr. Ferguson's office has now set its sights on conservative activist Alan Gottlieb and

21   a number of nonprofit and other entities he is associated with. Each of these entities is

22   dedicated to causes with which Mr. Ferguson's office disagrees. Specifically, the Second

23   Amendment Foundation ("SAF") and the Citizens Committee for the Right to Keep and Bear

24   Arms ("CCRKBA") are nonprofit organizations that advocate for civil rights related to self-

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 2

defense, gun ownership, including by bringing litigation challenging laws they believe are unconstitutional (in the case of SAF and CCRKBA) and by educating grass roots activists, the public, legislators, and the media (in the case of CCRKBA). The Center for the Defense of Free Enterprise ("CDFE") is a nonprofit organization that educates the public regarding the free enterprise system and individual economic and property rights, and it supports the legal defense of those rights. The Service Bureau Association is a nonprofit organization that provides support services to SAF, CCRKBA, and CDFE, so they can function economically. Liberty Park Press ("LPP") is a media company that operates a website dedicated to providing news to the public so people can make informed decisions to protect their personal liberties. And Merril Mail Marketing ("MMM") is a publishing company that has released pro-Second Amendment titles. Mr. Gottlieb is an officer of SAF, CCRKBA, CDFE, and SBA. He is also an owner of LPP and MMM.

As a consequence of their constitutionally protected advocacy, Mr. Gottlieb and these entities (collectively, "the plaintiffs") often find themselves at odds with Mr. Ferguson's office. In particular, Mr. Ferguson has often been a vocal proponent of gun control measures, which have led the plaintiffs to clash with him in and out of court. Regardless of one's views on gun control policy, this oppositional give-and-take is the cause and result of a healthy democracy—the plaintiffs' advocacy facilitates the enactment of policy that accurately represents the will of an informed electorate, and their litigation ensures the laws on the books comply with constitutional guaranties. But Mr. Ferguson's office does not see it that way.

Over the last two years, the Consumer Protection Division of the Attorney General's Office ("CPD") has carried out an expansive, highly intrusive probe into the private affairs of SAF, CCRKBA, CDFE, SBA, LPP, MMM, Mr. Gottlieb, and his family. It has served Civil Investigative Demands ("CIDs") on each of the plaintiffs, including two on Mr. Gottlieb,

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 3

1    citing the same consumer protection laws Mr. Ferguson was recently found to have abused.

2    These CIDs demanded, on penalty of legal action, that the plaintiffs review and produce tens

3    of thousands of pages of private documents and detailed written responses to dozens of

4    interrogatories, in some instances concerning events that happened over 40 years ago. CPD

5    has already required Mr. Gottlieb to submit to a full day-long deposition, and it has scheduled

6    more, planning to take his testimony as a representative of SAF, CCRKBA, and SBA. It has

7    repeatedly scheduled, postponed, and rescheduled additional depositions of a SAF and

8    CCRKBA employee, Mr. Gottlieb's son, who works for SAF, and Mr. Gottlieb's wife, who

9    serves on the boards of MMM, SBA, CDFE, and LPP. And CPD has served CIDs on many of

10   SAF's vendors and business associates—in some cases accompanied by gag orders

11   prohibiting them from discussing the CIDs with SAF or the public—potentially doing lasting

12   damage to SAF's and other CID recipients' business relationships. For an extended period,

13   SAF and CCRKBA were unable to communicate with its long-time accountants, only later

14   learning that the accountants had gone silent due to one of the AG's gag orders. SAF and Mr.

15   Gottlieb have been forced to expend hundreds of man hours and over one hundred thousand

16   dollars in legal fees just responding to these demands, and there is no end in sight.

17       Throughout this protracted process, CPD has claimed to be investigating unlawful

18   conduct and enforcing the law. But in the *over two years* of investigating, it has never

19   identified any unlawful conduct whatsoever, nor asked or directed that any of the plaintiffs

20   make changes to their practices. In fact, CPD has never even been able to explain why it

21   initially suspected any of the plaintiffs had engaged in unlawful conduct. Public records

22   requests reveal—and CPD all but admits—that it has received virtually no consumer

23   complaints regarding SAF or any other CID recipients. When pressed for information about

24   what the plaintiffs are suspected to have done wrong or should be doing differently, CPD's

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 4

attorneys have offered only a vague suggestion that some unidentified entity or entities associated with Mr. Gottlieb have not properly registered as a charity with the Secretary of State, or have registered but have failed to make complete disclosures with their registrations. Plaintiffs have examined their own records, reported back to CPD that they cannot tell what CPD is talking about, and requested that CPD stop being so cryptic and just explain what this interminable investigation is really about. CPD has provided no answer because it has no answer.

As the months have worn on without any justification emerging for the origin or continuation of CPD's comprehensive probe, it has become increasingly clear that CPD has never had any reasonable basis for suspecting any of the plaintiffs of violating the statutes listed in its CIDs—or any other laws for that matter. Instead, CPD singled out SAF and Mr. Gottlieb for invasive and expensive harassment because of their political beliefs and activities, including their positions on gun control, their outspoken public criticism of Mr. Ferguson, and their legal challenges to his actions and policies. The other plaintiffs have been dragged into the investigation because of their support for and association with SAF and Mr. Gottlieb's protected free speech activities. The agency's investigation is nothing more than a fishing expedition, conducted in the hope of turning up dirt on the Attorney General's political opponents, furthering Mr. Ferguson's political ambitions, and disrupting the lives of individuals Mr. Ferguson dislikes.

The wrongful nature of these actions transcends politics. Regardless of one's policy preferences or partisan affiliation, the official misuse of legal process to pursue private vendettas and stamp out dissent is incompatible with a free democratic society. Defendants' actions are illegal and unconstitutional, and they should not be allowed.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 5

## II.   PARTIES

1.      Alan Gottlieb is the Founder and Executive Vice President of SAF. Born in 1947 in Los Angeles, California, he has a degree in nuclear engineering. Mr. Gottlieb has been involved in the gun rights movement since the early 1970s. In addition to founding SAF in 1974, Mr. Gottlieb has also been involved in a number of other pro-gun and conservative organizations and initiatives. He is the chairman of CCRKBA; a Director of the American Conservative Union; a Director of the American Political Action Committee; a Director of Protect Our Gun Rights; a Director of International Association to Protect Civilian Arms Rights; a Director of CDFE; a Director of SBA; a Director and owner of MMM, through which he has published pro-Second Amendment titles and other political titles by himself and others; a Director of Jews for the Preservation of Firearms Ownership; a Director and owner of LPP; and a Director of Keepandbeararms., Inc. Mr. Gottlieb is a frequent commentator on gun rights issues online and on radio and television, and has been quoted in numerous media outlets, including The New York Times, The Washington Post, and CNN. He has also authored or co-authored several books on gun rights and related issues.

2.      SAF is a nonprofit 501(c)(3) corporation organized under the laws of Washington and headquartered in Bellevue. Founded in 1974, SAF's mission is to defend and promote the right of law-abiding citizens to own and use firearms for self-defense, hunting, and other lawful purposes. The organization's activities include legal action to protect Second Amendment rights, public education campaigns, and support for research into the benefits of firearms ownership. It funds these activities through donations from its members and supporters nationwide, including thousands in Washington State.

3.      CCRKBA is a 501(c)(4) advocacy group organized under the laws of Washington and headquartered in Bellevue. Founded in 1971, Mr. Gottlieb has served as

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 6

1   CCRKBA's chairman since 1972. CCRKBA is a lobbying organization. Like SAF, it is

2   dedicated to defending and promoting the right of law-abiding citizens to own and use

3   firearms. Unlike SAF, CCRKBA's efforts center on actively influencing firearms policy at all

4   levels of government through political activities, including meeting with legislators and

5   donating to and supporting particular political initiative campaigns.

6       4.      LPP is a closely held media corporation that focuses on news and commentary

7   related to firearms, Second Amendment rights, and other issues related to personal freedom

8   and individual liberties. The company was founded by Mr. Gottlieb in 2013; it is organized

9   under the laws of Washington State and headquartered in Bellevue. LPP owns and operates a

10  website and publishes content including news articles, opinion pieces, and analysis of issues

11  related to firearms, self-defense, politics, and other topics of interest to readers who value

12  individual liberties and personal freedom.

13      5.      MMM is a book publisher that has published pro-Second Amendment titles by

14  Mr. Gottlieb and others.

15      6.      CDFE is a 501(c)(3) nonprofit organization organized under the laws of

16  Washington State and headquartered in Bellevue. Founded in 1976, it is dedicated to

17  advocating for free-market principles and limited government. The organization seeks to

18  achieve these goals through research, education, and advocacy on a range of economic,

19  environmental, and political issues.

20      7.      SBA is a nonprofit corporation registered in Washington State. SBA provides

21  its members, SAF, CCRKBA, CDFE, and Merril Associates (a sole proprietorship of Mr.

22  Gottlieb) with data processing, IT services, accounting, caging, group health insurance, long

23  term care insurance, large machine purchases or leases and other services. By bulk purchasing

24  and sharing the expense of services and equipment, SBA allows its members to access goods

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 7

1    and services that would not otherwise be financially feasible. All services are provided at cost

2    and billed to members according to usage.

3        8.    Defendant Robert Ferguson is the Attorney General of the State of

4    Washington. First elected in 2012, he is the State's chief legal officer and serves as the legal

5    advisor to the governor, state agencies, and other elected officials. *See* RCW 43.10.030(5). He

6    is also responsible for defending state officials sued in their official capacity, and in this role

7    he frequently defends the constitutionality of state statutes. *Id.* at (2). He is responsible for

8    enforcing the laws of the state, including by investigating suspected violations and bringing

9    legal action where appropriate. He is sued in both his individual and official capacity.

10       9.    Joshua Studor is an Assistant Attorney General within the Consumer

11   Protection Division of the Washington Attorneys General Office. As Assistant Attorney

12   General, he holds office at the Attorney General's Pleasure (subject to any collective

13   bargaining agreement). RCW 43.10.060. CPD is responsible for protecting the rights of

14   consumers in Washington State, including by enforcing state and federal consumer protection

15   laws and investigating and prosecuting businesses and individuals that engage in unfair or

16   deceptive practices. Mr. Studor is leading the investigation of Mr. Gotttlieb and SAF. He is

17   sued both individually and in his official capacity.

18       10.   The Washington Attorney General's Office is the state agency presently

19   headed by Mr. Ferguson. It is tasked with assisting him and carrying out his duties as

20   Washington Attorney General.

21                    **III.    JURISDICTION AND VENUE**

22       11.   This Court has original subject matter jurisdiction over these claims pursuant

23   to RCW 2.08.010.

24

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 8

12.      Venue is proper under RCW 4.12.020(2) and RCW 4.92.010(2) because the events giving rise to these claims occurred within this county.

### IV.      STATEMENT OF FACTS

**A.      This is not the first of Bob Ferguson's unfounded attacks on political opponents or unfounded use of his power under the Consumer Protection Act.**

13.      Washington Attorney General Bob Ferguson has made his antipathy to conservative policies and politicians a mark of pride throughout his time in office. Even before listing his legal background and education or accomplishments in office, for example, Mr. Ferguson's campaign website proudly boasts of his "legal record against the Trump Administration," noting that he filed "more than 80 lawsuits" against it.[1] Relatedly, Mr. Ferguson has frequently utilized the CPD to position himself politically and identify his political opposition. The same site states that "Bob has made consumer protection a cornerstone of the Attorney General's Office – cracking down on powerful interests that don't play by the rules." It further notes that "Bob has doubled the size of the Consumer Protection Division in the Attorney General's Office."

14.      Mr. Ferguson's political beliefs have repeatedly led him and his office to overzealousness. When discussing his record against the Trump administration, for instance, his website explains that less than half of the "more than 80 lawsuits" resulted in "wins's [sic] under Bob's leadership," indicating a majority of the suits were unfounded.

---

[1] About Bob Ferguson, Bob Ferguson Democrat Attorney General, https://bobferguson.com/about/ (last visited Mar. 14, 2023). Since the initial filing of this suit in federal court, Mr. Ferguson's campaign website has been updated to reflect his new gubernatorial campaign, though the new site contains many similar statements to the previous one.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 9

15.     On May 2, 2023, Mr. Ferguson announced that he is running for Governor of Washington.   He specifically touted his repeated battles with conservative causes in the announcement, stating, "From the Trump Admin & gun lobby to anti-abortion extremists & corporate interests, I've taken on powerful adversaries, and won. That's just the start. I'm proud to announce my exploratory campaign for WA Gov."[2]

16.     CPD in particular has become overenthusiastic under Mr. Ferguson's leadership, pursuing frivolous investigations and prosecutions of law-abiding citizens and their business ventures. This tendency was highlighted in the Washington Supreme Court's recent decision in *Washington v. TVI, Inc.*, 524 P.3d 622, 627 (Wash. 2023). The case involved Value Village, a for-profit thrift store chain whose business model consisted of paying non-profit charities for community-donated goods that it then resold or recycled, providing the charities with a reliable stream of income while simultaneously obtaining its stock for less than typical wholesale prices. *Id.* First, though the Washington Secretary of State's office had contacted Value Village *three times* regarding its status under the Washington Charitable Solicitations Act and each time determined that the business was *not* required to register with the State as a commercial fundraiser, CPD wrote to Value Village in November 2014 demanding that it register and renew its status annually. *Id.* at 628. Value Village promptly complied, but this was not the end of CPD's harassment.

17.     Value Village was very open regarding its status as a for-profit business. Its website and in-store signs and brochures described its business model in detail, much of its marketing explicitly described it as a "for-profit thrift store chain," and Value Village

---

[2] David Gutman and Jim Brunner, *WA Attorney General Bob Ferguson announces campaign for governor,* SEATTLE TIMES (May 2, 2023), https://www.seattletimes.com/seattle-news/politics/wa-attorney-general-bob-ferguson-announces-campaign-for-governor/.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 10

employee's regularly made announcements over the stores' public address system stating that it was a for-profit business. *Id.* at 627-28. Despite this transparency, CPD subjected Value Village to a highly invasive three-year long investigation before bringing a lawsuit against it alleging that it had violated the Consumer Protection Act ("CPA") by misleading customers into believing it was itself a non-profit or charitable organization. *Id.* at 628.

18.     The Washington Supreme Court ruled that the CPD's actions were unconstitutional. CPD's "broad allegations 'impermissibly chill[ed] protected speech,'" the Court held, and even in the one instance in which CPD had alleged a valid claim, that claim was "not supported" by any proof whatsoever. *Id.* at 638-39 (citing *Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 619 (2003)). The Court thus remanded the case to the trial court with instructions to dismiss CPD's CPA claims and rule on whether Value Village was entitled to the attorney fees and costs it had incurred defending against the unconstitutional charges. *Id.* at 639.

19.     Mr. Ferguson remained uncontrite despite the Supreme Court's admonition. Value Village had altered its marketing during the course of CPD's investigation in a futile attempt to placate the agency, and though the Washington Supreme Court's ruling made clear the pressure CPD had exerted was unconstitutional, Mr. Ferguson bragged about its results: "'We are proud that our investigation led Value Village to change its marketing practices and more clearly disclose that it is a for-profit company,' Ferguson said."[3]

20.     On remand in *Value Village*, CPD argued that is actions should not be punished with an attorney fee award because "public policy favors robust enforcement of the

---

[3] Gene Johnson, Associated Press, *Court rejects deception charges against Savers Value Village*, Seattle Times (Feb. 23, 2023), https://www.seattletimes.com/seattle-news/wa-supreme-court-rejects-states-allegations-against-savers-value-village/.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 11

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

CPA." Order, Dkt. 352, *State v. TVI, Inc. d/b/a Value Village*, No. 17-2-32886 (King. Cnty. Sup. Ct. Aug 9, 2023). This court disagreed.  In its order, the court stated that CPD's "conduct raise[d] concerns about government overreach" and specifically cited CPD's multi-year investigation in which it refused to "identify any claims or practices that [CPD] asserted [Value Village] should change." *Id.* at 8, 16.  The trial court had previously found that, "if the purpose of the [Charitable Solicitations Act] is to prevent public harm before it occurs, or as early as possible, the State's decision not to communicate with [Value Village] conflicts with this purpose." *Id.* at 5.  The court also noted that, even though CPD "admitted it had no evidence and could not show that any consumer or donor was in fact ever misled or harmed by [Value Village] advertising or marketing," it nonetheless had "issued press releases asserting that [Value Village] had 'deceived' Washington consumers and did not pay its charity partners for many or most donated goods," which both the trial and multiple appellate courts found to be false. *Id.* at 9, 22.  It further observed that the CPD had "denigrated" Value Villages First Amendment defense and "continually requested reconsideration of rulings, despite unanimous opinions rejecting [CPD's] arguments and holding that [its] actions violated established First Amendment principles." *Id.* at 9, 18.  This court stated that CPD "appear[ed] unchastened by these higher court decisions," and described its attitude towards Value Village's First Amendment rights as "dismissive." *Id.* at 18-19.  Ultimately, this court granted Value Village's motion for attorney fees; final approval of the over $5 million bill— which includes Value Village's substantial costs associated with responding to CPD's overzealous investigation—is pending as of this filing.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 12

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**B.      Mr. Ferguson's Office has Unconstitutionally Targeted and Harassed Mr. Gotlieb and SAF because of their Political Beliefs**

21.      As he boasted in his gubernatorial announcement, gun control policy has been one of Mr. Ferguson's primary focuses while in office. He has championed a series of state legislative enactments restricting citizens' rights to keep and bear firearms, including a ban on the sale of magazines holding more than 10 rounds,[4] a ban on the manufacture or possession of 3D-printed firearms,[5] a ban on the possession of semi-automatic rifles, and measures that would hold gun manufacturers and dealers liable for damages caused by unrelated individuals using their products.[6] When county sheriffs expressed doubts over whether certain new gun control measures were constitutional, Mr. Ferguson personally issued an open letter warning that the sheriffs may be held liable if they failed to enforce them.[7]

22.      Mr. Ferguson received an award from the anti-gun rights organization CeaseFire in 2017 and spoke at a CeaseFire live event in 2019, and he has tweeted out praise for the Alliance for Gun Responsibility, Grandmothers Against Gun Violence, and CeaseFire. In 2018, Mr. Ferguson broke from tradition and endorsed a ballot measure generated by the Alliance for Gun Responsibility aimed at raising the age to purchase a semi-automatic rifle.

---

[4] Washington State Office of the Attorney General, *AG Ferguson: With historic House vote, Legislature bans sale of high-capacity magazines in Washington* (Mar. 4, 2022), https://www.atg.wa.gov/news/news-releases/ag-ferguson-historic-house-vote-legislature-bans-sale-high-capacity-magazines.

[5] Washington State Office of the Attorney General, *Attorney General Ferguson's bill to ban 3D-printed "ghost guns" passes Legislature* (Apr. 23, 2019), https://www.atg.wa.gov/news-releases/attorney-general-ferguson-s-bill-ban-3d-printed-ghost-guns-passes-legislature.

[6] Washington State Office of the Attorney General, *AG Ferguson, Gov. Inslee partner to propose two firearms safety measures* (Dec. 19, 2022), https://www.atg.wa.gov/news-releases/ag-ferguson-gov-inslee-partner-propose-two-firearms-safety-measures.

[7] David Gutman, *Sheriffs who don't enforce Washington's new gun law could be liable, AG Bob Ferguson says*, Seattle Times (Feb. 12, 2019), https://www.seattletimes.com/seattle-news/politics/sheriffs-who-dont-enforce-washingtons-new-gun-law-could-be-liable-ag-bob-ferguson-says/.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 13

Mr. Ferguson has also appeared as a speaker at events put on by the Alliance for Gun Responsibility, which has praised his work online.

23.     As a consequence of the enactments discussed above and Mr. Ferguson's policy preferences more broadly, Mr. Ferguson's office has frequently clashed with SAF and Mr. Gottlieb.

24.     Most significantly, SAF, CCRKBA, and CDFE have often challenged these gun control measures in court, arguing that they violate the Second Amendment or other constitutional guarantees. Mr. Ferguson and his office are responsible for defending the constitutionality of Washington laws, and Mr. Gottlieb and Mr. Ferguson have consistently found themselves on opposite sides of the courtroom. Counting appeals, they have been opposing parties in at least eight different cases since Mr. Ferguson took office. *See N.W. Sch. of Safety v. Ferguson*, No. 3:14-cv-6026-BHS (W.D. Wash. 2014); *N.W. Sch. of Safety v. Ferguson*, No. 15-35452 (9th Cir. 2015); *Washington v. United States*, No. 2:18-cv-01115-RSL (W.D. Wash. 2018); *Mitchell v. Washington*, no. 3:18-cv-05931-RBL (W.D. Wash. 2018); *Washington v. Def. Distributed*, No. 20-35030 (9th Cir. 2020); *Washington v. Second Amendment Foundation*, No. 20-35064 (9th Cir. 2020); *Mitchell v. Atkinson*, No. 20-35827 (9th Cir. 2022); *Sullivan v. Ferguson*, No. 3:22-CV-05403-DGE (W.D. Wash. 2022). The number is even larger counting cases involving similar gun control laws in other states in which Mr. Ferguson's office has filed amici briefs opposing SAF's position or vice versa. *See, e.g.*, *Wrenn v. District of Columbia*, Nos. 16-7025& 16-7067 (D.C. Cir. 2016); *Worman v. Healy*, No. 18-1545 (1st Cir. 2018); *Duncan v. Becerra*, No. 19-55376 (9th Cir. 2019); *Duncan v. Bonta*, No. 19-55376 (9th Cir. 2019).   Indeed, Mr. Ferguson considers his opposition to SAF a personal accomplishment.  When the governor signed a law restricting the sale of assault weapons on April 25, 2023, Mr. Ferguson took to the television cameras

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 14

that same day to brag that his office supposedly had an undefeated record in litigation against SAF and looked forward to litigating against it again.

25.     The conflict between Mr. Ferguson's office and SAF has also played out in the media. Mr. Gottlieb, SAF, and other Alan Gottlieb-associated entities have released public statements criticizing Mr. Ferguson's views on gun control and the legislation he champions. *See, e.g.*, CCRKBA, Press Release, *CCRKBA Says Court Ballot Title Changes To WA Gun Initiative A 'Small Victory* (Jun. 07, 2018);[8] SAF, Press Release, *SAF-NRA Amends Challenge to I-1639; Anti-Gunners Wrong, Lawsuit Remains* (Feb. 14, 2019);[9] SAF, Press Release, *Fed. Judge Denies Motion by Washington A.G. to Compel SAF Discovery in 3D Case* (Mar. 25, 2019);[10] Dave Workman, *We Definitely Plan to Appeal Says SAF on Fed. Court Ruling*, thegunmag.com (Sept. 2, 2020);[11] Dave Workman, *Exclusive: Spokane County Sheriff Rips AG Ferguson, I-1639,* Liberty Park Press (Feb. 13, 2019);[12] Dave Workman, *Anti-gun WA Atty. General Ferguson Endorses Gun Control Measure*, Liberty Park Press (Apr. 25, 2018);[13] Gun-rights advocates file lawsuit to block I-1639, The Daily World (Nov. 16, 2018).[14]   Mr. Ferguson has returned the favor, publicly accusing SAF of attempting to

---

[8]   https://www.prnewswire.com/news-releases/ccrkba-says-court-ballot-title-changes-to-wa-gun-initiative-a-small-victory-300662117.html

[9]   https://www.saf.org/saf-nra-amends-challenge-to-i-1639-anti-gunners-wrong-lawsuit-remains/

[10]   https://www.saf.org/fed-judge-denies-motion-by-washington-a-g-to-compel-saf-discovery-in-3d-case/

[11]   http://www.thegunmag.com/we-definitely-plan-to-appeal-says-saf-on-fed-court-ruling/

[12]   https://www.libertyparkpress.com/exclusive-spokane-county-sheriff-rips-ag-ferguson-i-1639/

[13]   https://www.libertyparkpress.com/anti-gun-wa-atty-general-ferguson-endorses-gun-control-measure/

[14]   https://www.thedailyworld.com/northwest/gun-rights-advocates-file-lawsuit-to-block-i-1639/

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 15

"undermine the will of the voters" with its legal challenges to the constitutionality of gun control laws. Jim Camden, *Washington's Voter-Approved Semiautomatic Rifle Restrictions Constitutional, Judge Rules*, Spokesman-Review (Sept. 1, 2020).[15]

26.     Regardless of one's opinion on constitutional rights under the Second Amendment, there's no dispute that the actions of Mr. Gottlieb, SAF, and the other CID recipients are constitutionally protected conduct. The Constitution mandates Mr. Ferguson's disagreements with plaintiffs over the Second Amendment and other laws be resolved in courts of law and his policy disputes settled in the court of public opinion. But Mr. Ferguson's office has adopted a different tactic.

27.     At an unidentified time more than two years ago, CPD began to investigate Mr. Gottlieb and SAF in much the same way it had Value Village. Upon information and belief, this investigation was begun at Mr. Ferguson's instruction and/or as a consequence of policies and customs he implemented and is responsible for. Despite the public records requests discussed below, Mr. Gottlieb and SAF have been unable to determine when the investigation began.

28.     By June 4, 2021, CPD had obtained a gag order from King County Superior Court that had the practical effect of totally preventing SAF's accountants from speaking with SAF, interrupting SAF's ability to timely complete audits of its finances. Apparently, CPD served the accountants with CIDs requesting sweeping information regarding SAF and Mr. Gottlieb and prohibiting them from notifying SAF or otherwise discussing CPD's demands. The legal authority for such a prior restraint of speech is unclear.

---

[15]     https://www.spokesman.com/stories/2020/aug/31/semiautomatic-rifle-restrictions-constitutional-ju/

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 16

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

29.     Within a few months, CPD served similar demands and gag orders on an array of other third parties, including the essential vendors that make the activities of SAF and the other CID recipients possible. These included everyone from SAF's webhost to the utility company that provides its electricity.

30.     To date, SAF and Mr. Gottlieb do not know the precise number or terms of CIDs that CPD has issued to third parties. When pressed, CPD has bizarrely claimed that it obtained gag orders against these people and organizations for *SAF's benefit*, asserting that they had prohibited them from discussing the CIDs in order to protect SAF's reputation. This explanation is bogus and CPD knows it. The CIDs and gag orders have themselves, as designed, severely damaged plaintiffs' reputations and ability to work with the third-party CID recipients, who could easily decide working with plaintiffs is not worth the legal bills and potential liability.

31.     On May 5, 2022, CPD began serving CIDs directly upon Mr. Gottlieb, SAF, and other entities associated with Mr. Gottlieb. The CIDs contained dozens of interrogatories and requests for extensive document production, as well as multiple demands that Mr. Gottlieb and others sit for depositions. In some instances, the CIDs explicitly demanded information regarding events that occurred more than four decades prior that could have been retrieved from the public records of lawsuits the CPD already knew about. Along with the same Consumer Protection and Charitable Solicitations Acts that CPD cited during its harassing investigation of Value Village, the CIDs strangely claimed that CPD was looking into possible violations of the Washington Telecommunications Act and Telemarketing Sales Rule. Although the investigation was carried out at Mr. Ferguson's instruction and in accordance with his policies, the demands were signed by Mr. Studor on behalf of Mr. Ferguson and specified that all responses were to be delivered to Mr. Studor.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 17

32.     Not understanding the point of the investigation and having nothing to hide, Mr. Gottlieb and SAF fully cooperated and complied. They retained counsel to assist them with responding to the demands, and over the last year they have expended over $100,000 in legal fees and hundreds of man hours drafting and providing dozens of detailed written answers and reviewing and producing tens of thousands of pages of financial records, personal correspondence, and CPA private information.

33.     Throughout this process, counsel for Mr. Gottlieb and SAF have repeatedly asked for an explanation of what unlawful activity they are suspected of having committed. CPD, through Mr. Studor, has offered only nonspecific and illogical answers. It has made vague references to unlawful auto-dialing, but neither SAF nor any of the other entities associated with Mr. Gottlieb have ever used automated dialing technology of any kind. At one point, CPD appeared to instead be pursuing a theory that Mr. Gottlieb unjustly enriched himself by leasing his office building in Bellevue to SAF or in connection with the early 1980s purchase and sale or a building and land in Bellevue. But these same claims were considered and rejected by the King County Superior decades ago. And even a cursory look at prevailing lease rates in Bellevue is enough to demonstrate that SAF is dramatically *underpaying* for its space. CPD then appeared to pursue a similar theory regarding the support services that Mr. Gottlieb's company Merril Associates provides to SAF. But Merril Associates charges rates that were set and approved by the King County Superior Court decades ago. Moreover, all transactions between SAF and any companies in which Mr. Gottlieb has an interest are approved by SAF's board, with Mr. Gottlieb abstaining, disclosed in its public tax filings, audited by CPAs with the audits posted on SAF's website (SAF.org), and consistently audited by the IRS. Pivoting from its baseless claims of self-dealing, CPD next suggested that SAF had misled donors as to how it would use their donations (an

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 18

accusation quite similar to the one against Value Village that the Washington Supreme Court found was totally baseless). But like the other flimsy excuses, these allegations are completely unfounded—SAF's messaging is explicit and accurate as to how it will use donations, and CPD has not identified a single misleading statement Mr. Gottlieb or any plaintiff organization has made.

34.     At a loss regarding CPD's motives, counsel for Mr. Gottlieb and SAF's attorneys submitted a Public Records Act request to the Attorney General's Office on August 8, 2022, seeking all documents reflecting the origins and nature of the investigation and any allegations that have been made against them.

35.     The Attorney General's Office still has not fully complied with that request and still, over a year after the request was submitted, has not even given SAF a reasonable estimate of the time it will require to fully respond.

36.     On August 15, 2022, the Attorney General's Office said it would provide "an installment" of responsive documents by September 15, 2022. On September 6, 2022, it said it anticipated the process would be complete by September 30, 2022. But on October 26, 2022, the Attorney General's Office said the process would take until November 18, 2022. That statement was misleading as well. On December 27, 2022, the Attorney General's Office said another batch of documents would arrive on January 20, 2023. On March 2, 2023, more documents arrived, along with a note that even more would be supplied by March 24, 2023. When asked if that would be the last batch of documents, the Attorney General's Office responded that it did not know, gave no reasonable estimate of the time it required to finally fully comply with SAF's request, and gave no explanation for the delays to that point. As recently as September 7, 2023, the State produced another batch of records, saying that yet

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 19

another batch would be arriving later in the month. Still there is no estimate from the State about when it will finally and fully comply with the Public Records Act.

37.   Over the months in which the Attorney General's Office has flouted the Public Records Act with its foot-dragging, it has slowly produced documents containing nothing more than pleadings from litigation with SAF and a small handful of run-of-the-mill complaints of the type every charitable organization receives, all of which were promptly handled and none of which suggested illegal activity. The one unusual complaint in the bunch came from an eager donor who protested that SAF was not sending solicitations frequently enough.

38.   On January 12, 2023, Mr. Gottlieb sat for the first of several days of depositions CPD has demanded from him. Even hours of questioning did not illuminate the purpose or origin of CPD's dissection of Mr. Gottlieb's life and SAF's actions. The questions were cast in so many directions, CPD appeared to have abandoned its claim that SAF had misled donors, instead interrogating Mr. Gottlieb regarding topics like legal disputes that were conclusively resolved decades ago and an email between two third parties from over twenty-three years ago in which a political consultant mentions having had a conversation with Mr. Gottlieb. As the meandering questioning continued, it became increasingly clear that CPD had never had any reasonable basis for suspecting SAF or Mr. Gottlieb of violating the statutes listed in the CIDs or any other laws.

39.   Though the deposition did not reveal any illegal activity on the part of Mr. Gottlieb, it did confirm that *Mr. Ferguson's office* had violated Washington Law by silently withholding documents it should have produced in response to counsel's public records request. On August 8, 2022, SAF sent a Public Records Act request for "All non-privileged documents related to [CPD's] ongoing investigation of [SAF]," "All other CPD documents

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 20

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1   mentioning [SAF, CCRKBA, CDFE, LPP, MMM, MA, SBA, and Alan Gottlieb]," and "All

2   other documents within the Office of the Attorney General outside of [CPD] mentioning one

3   of the above-listed entities." Despite these clear requests, Mr. Studor confronted Mr. Gottlieb

4   at his deposition with the December 16, 1999, email from the political consultant mentioned

5   above. CPD considers this document non-privileged as it made it an exhibit to a deposition.

6   CPD also considers it related to the investigation as it questioned Mr. Gottlieb about it. And

7   the document plainly mentions Mr. Gottlieb. Despite the Attorney General's Office being

8   self-evidently aware of the document's existence and responsiveness to the Public Records

9   request, the Office had withheld it without even claiming any legal basis for doing so. The

10  Office could not have assumed Mr. Gottlieb already had the email, as it was not written by or

11  addressed to him.

12      40.     Frustrated by the realization that the multiple year investigation was truly

13  baseless and motivated by sheer political animus, counsel for Mr. Gottlieb wrote to CPD, via

14  Mr. Studor, on January 23, 2023, demanding the investigation cease and that CPD disclose all

15  CIDs it had served on third parties and reimburse Mr. Gottlieb and SAF for their legal fees.

16  Mr. Studor responded on March 2 in a letter claiming that, actually, CPDs investigation had

17  already "uncovered significant evidence" that SAF and Mr. Gottlieb "ha[d] violated the law."

18  For the first time in the over two years of investigations, Mr. Studor presented *an entirely new*

19  *legal* theory—that SAF or other CID recipients (the letter did not specify which) had

20  "violated the law for many years by soliciting charitable contributions and engaging in

21  commercial fundraising without registering with the Secretary of State." Mr. Studor further

22  contended that "[e]ven those that registered properly failed to include many of the disclosures

23

24

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 21

required by law."[16] Mr. Studor claimed that, rather than political animus, "[t]he AGO's purpose in our investigation of your clients is to ensure compliance with state law – nothing more."

41.     SAF, interested as ever in fully complying with the law, promptly audited the registration status of all of the Gottlieb-related entities that had received CIDs. On March 7, SAF wrote back to Mr. Studor pointing out that each of the entities at issue was either exempt from registering with the Secretary of State under applicable statutes or *had* in fact registered and made all required disclosures. SAF's counsel pleaded with Mr. Studor for an explanation: "If your only purpose is to ensure compliance with the law, then tell me which one of my clients is violating the law, which law they are violating, and what they are doing wrong, so my clients can address the alleged non-compliance. My clients have every intention of complying with the law, as evidenced by the efforts they have undertaken to cater to your office's demands in this investigation." Mr. Studor never provided clarification of which entities he believed had not properly registered or what other unlawful activity he believed Mr. Gottlieb and SAF had committed. Though Mr. Studor claimed some unidentified entities had been violating the law for many years, he declined to provide any instructions on how they could bring their conduct into compliance with the law. Instead, he just pressed to set more deposition dates.

42.     The Attorney General's Office was unable to provide any clarification in response to SAF's inquiries because—like all the other flimsy explanations CPD has proffered—the claims regarding registration are pretextual and knowingly false. CPD has

---

[16] As noted, CPD made very similar allegations against Value Village during its unlawful investigation, accusing it of unlawfully failing to register despite the Secretary of State telling the organization *three separate times* that registration was not required. *TVI, Inc.*, 524 P.3d at 627.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 22

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

conducted a destructive multi-year investigation of Mr. Gottlieb and SAF not because it has reason to suspect any wrongdoing, but because Mr. Ferguson and his subordinates disagree with their political beliefs.  Knowing there is no viable legal claim to bring against SAF or Mr. Gottlieb, an investigation is the only way they can use their power to punish SAF and Mr. Gottlieb and deplete their resources. Mr. Ferguson, Mr. Studor, and CPD wish to punish SAF, Mr. Gottlieb, and related entities, both for their activism generally and for their having the temerity to publicly challenge Mr. Ferguson. They hope to find some evidence—any evidence at all—of unlawful activity that it can use as justification for going after the Attorney General's political enemies. Barring that, they just hope to chill Plaintiffs' First Amendment activity by driving up the cost of disagreeing politically with the Attorney General, making their lives miserable, and wasting the time and money that could otherwise go towards their mission. And they hope that all of these actions will benefit Mr. Ferguson politically, including in his new run for governor, by reinforcing perceptions of him as a champion against conservative entities and causes that are unpopular with his supporters.

43.     The implications of this type of campaign of harassment transcend partisan politics. In a free and democratic society, it is unacceptable for officials to conspire to use the powers of state to silence their critics. Indeed, such conspiracy is a federal crime in itself. *See* 18 U.S.C. § 241. For the protection of democracy and constitutional liberties, Mr. Ferguson's office must be ordered to cease its harassment and held accountable for its unconstitutional actions.

**C.**     **Procedural History**

44.     After CPD refused to respond to SAF and Mr. Gottlieb's repeated requests for clarification and with all options for amicable resolution exhausted, SAF and Mr. Gottlieb finally on May 3, 2023, filed suit against Mr. Ferguson, Mr. Studor, and the Attorney

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 23

General's Office (collectively, "State Defendants") in the United States District Court for the Western District of Washington. Their complaint raised the same causes of actions asserted herein, including that CPD's discriminatory and retaliatory harassment violated the First and Fourth Amendments to the United States Constitution.

45.     On June 12, 2023, the State Defendants filed a motion to dismiss that primarily challenged federal jurisdiction.    These objections to federal jurisdiction were largely baseless[17] and in many instances mischaracterized SAF and Mr. Gottlieb's claims.[18] Nevertheless, SAF and Mr. Gottlieb decided that litigating ancillary issues of federal jurisdiction was a waste of time and resources and a distraction from the underlying merits of

---

[17] For example, State Defendants argued that SAF and Mr. Gottlieb lacked standing because they had not alleged that their speech had actually been chilled by the sham investigation and the CIDs were not self-executing.  But it is well established that no speech actually needs to be chilled in order for a plaintiff to bring a First Amendment claim based on a discriminatory, retaliatory investigation. S*ee White v. Lee*, 227 F.3d 1214, 1241 (9th Cir. 2000); *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 239 (E.D.N.Y. 2009) ("Chilling is required to be alleged only in cases where a plaintiff states no harm independent of the chilling of speech.").    SAF and Mr. Gottlieb have specifically alleged reputational and emotional damages that were fully realized as a result of CPD's serving the CIDs, regardless of whether those CIDs are ultimately enforced by a court.  Moreover, by the time it became clear that CPD's investigation of SAF and Mr. Gottlieb was not based on any suspicion of unlawful conduct but was instead initiated and maintained based solely on political animus, the window for petitioning to set the CID aside under RCW 19.86.110(8) had long since passed, making State Defendants' petitioning a court for enforcement a mere formality.  State Defendants also argued that the federal court should refrain from disrupting state proceedings under the *Younger* abstention doctrine.  But even assuming *Younger* abstention could be applied to an investigation in which no formal state proceedings have been initiated whatsoever, the doctrine specifically *does not* apply when state proceedings are brought in bad faith for the purpose of harassment, *see Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982), which is precisely what SAF and Mr. Gottlieb alleged.

[18] State Defendants repeatedly claimed SAF and Mr. Gottlieb were seeking to enjoin a legitimate investigation because they believed it was being carried out in a biased manner. This is inaccurate. As here, SAF and Mr. Gottlieb's complaint alleged that there *was no* legitimate investigation and State Defendants' harassment was initiated and maintained based on political animus without any suspicion of unlawful activity.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 24

their suit. On July 10, 2023, they voluntarily dismissed their federal suit without prejudice so their claims could be refiled in state court. *See* Fed. R. Civ. P. 41(a)(1)(A)(i), (a)(1)(B).

46. The same day, SAF and Mr. Gottlieb filed a completed General Liability Claim Form #SF 210 with the Washington Office of Risk Management pursuant to RCW 4.92.100(1). The State has never responded to the claim in any way, despite the passage of more than 60 days.

## V. CAUSES OF ACTION
### Count I
### Viewpoint Discrimination
*42 U.S.C. § 1983, First and Fourteenth Amendments to the U.S. Constitution*
(Robert Ferguson and Joshua Studor, individually w/ respect to monetary damages and in their official capacities w/ respect to injunctive relief)

47. The foregoing paragraphs are incorporated herein as if set forth in full.

48. The First and Fourteenth Amendments to the United States Constitution prevent state officials from discriminating against individuals or organizations based on their speech or beliefs. *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 868 (9th Cir. 2016). These protections have their "broadest" application in the context of "political expression," as the First Amendment is specifically designed "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)). Thus, "[a] person's First Amendment free speech right is at its highest when that person engages in 'core political speech,' which includes *issue-based advocacy*" like SAF's opposition to restrictions on the right to bear arms. *Id.* (emphasis added) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995)).

49. It is well established that the First and Fourteenth Amendments prohibit officials from targeting individuals for enforcement actions discriminatorily based on the

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 25

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

political beliefs of the target. *See, e.g.*, *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011) (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)); *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir.2005); *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). An administrative investigation into supposed statutory violations also violates an individual or group's First and Fourteenth Amendment rights when it is motivated by animus to their Constitutionally protected beliefs, even if the officials "ultimately decide[] not to pursue either criminal or civil sanctions against them." *White*, 227 F.3d at 1228. "Informal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation' can violate the First Amendment also." *Id.* (quoting *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 67 (1963)).

50.   42 U.S.C. § 1983 allows the plaintiffs to bring a private cause of action for violation of their rights under the First and Fourteenth Amendments.

51.   Defendant's sham investigation of SAF and Mr. Gottlieb is substantially motivated by animus toward their political beliefs. They have not subjected other similarly situated individuals and organizations—that is, individuals and organizations involved in other types of political advocacy—to the type of suspicionless, invasive, and disruptive investigation detailed above. For instance, CPD has taken no known action, investigatory or otherwise, against the Alliance for Gun Responsibility, Grandmothers Against Gun Violence, Ceasefire, or any other anti-gun group that has given Mr. Ferguson an award or espoused the same view of the Second Amendment as Mr. Ferguson. The investigation of the plaintiffs constitutes unconstitutional viewpoint discrimination in violation of the First and Fourteenth Amendments.[19]

---

[19] In their federal motion to dismiss, State Defendants argued SAF and Mr. Gottlieb must allege their speech was actually chilled by State Defendants' actions to succeed on the merits of a

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 26

**Count II**
**Unconstitutional Retaliation**
*42 U.S.C. § 1983, First and Fourteenth Amendments to the U.S. Constitution*
(Robert Ferguson and Joshua Studor, individually w/ respect to monetary damages and in their official capacities
w/ respect to injunctive relief)

52.    The foregoing paragraphs are incorporated herein as if set forth in full.

53.    The federal First Amendment prohibits public officials from using their authority to retaliate against, obstruct, or chill citizen's expressive rights. *Arizona Students' Ass'n*, 924 F.3d at 867 (citing *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986)).

54.    Similarly, "the right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 896–897 (1984). The First Amendment therefore prohibits state officials from retaliating against an individual or group for their political advocacy, including their filing of lawsuits challenging laws or official policy. *CarePartners, LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008).

55.    A claim for unconstitutional retaliation exists where a state official takes an adverse action against a party that is substantially motivated by the party's protected conduct. *Arizona Students' Ass'n*, 924 F.3d at 867 (citing *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016)). An adverse action is any action that would chill a person of ordinary firmness from exercising their constitutional rights. *Id.*  As with a viewpoint discrimination claim, an administrative investigation can constitute unconstitutional retaliation in violation of an individual or group's First and Fourteenth Amendment rights if it is motivated by animus to their Constitutionally protected expression, even if the officials "ultimately decide[] not to pursue either criminal or civil sanctions against them."  *White*, 227 F.3d at 1228.  Again,

---

viewpoint discrimination claim.  That is flatly untrue; demonstrating an enforcement decision based on the content of protected speech is sufficient.  *See Hoye*, 653 F.3d at 854; *infra* ¶ 58.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

"[i]nformal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation' can violate the First Amendment also." *Id.* (quoting *Bantam Books,* 372 U.S. at 67.

56.     42 U.S.C. § 1983 allows the plaintiffs to bring a private cause of action for violation of their rights under the First and Fourteenth Amendments.

57.     A "plaintiff is not required to demonstrate that its speech was actually suppressed or inhibited" to prevail on a retaliation claim; "a plaintiff need only show that the defendant 'intended to interfere' with the plaintiff's First Amendment rights and that it suffered some injury as a result." *Id.* (quoting *Mendocino Envt'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999)); *see also Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (Posner, J.) ("The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.").

58.     The investigation of SAF is plainly an adverse action, both when it is considered in its entirety and with respect to the individual actions Defendants have taken toward Mr. Gottlieb, SAF, and the other CID recipients. Mr. Gottlieb and SAF have been forced to expend hundreds of man hours and tens of thousands of dollars in legal fees responding to CPD's CIDs. Moreover, CPD's investigation has placed considerable stress on Mr. Gottlieb's health as well as his personal life and professional life, and it has damaged the plaintiffs' reputations by suggesting to third-party CID recipients that they have violated the law. Vendors who have received CIDs may cease to do business with plaintiffs, believing CPD's false intimation that plaintiffs act illegally, or simply not wishing to deal with the hassle and legal fees of complying with current and future CIDs. Any person of ordinary

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 28

1    firmness in the position of any of the Plaintiffs would be discouraged from continuing to

2    engage in their customary First Amendment Activity by the CIDs.

3         59.     The CPD's adverse actions against Plaintiffs are substantially motivated by

4    Plaintiffs' protected conduct. There is no evidence of any legitimate reason for the

5    investigation to have ever even begun. There was no pattern of complaints from the public.

6    There was nothing to bring SAF to the CPD's attention other than its political speech and

7    litigation activities. And the few flimsy justifications Defendants have offered for their

8    sweeping incursion are pretextual. Defendants' responding to disfavored political speech and

9    other constitutionally protected activities by subjecting plaintiffs to an invasive, expensive,

10   and unfocused investigation constitutes unconstitutional retaliation.

**Count III**
**Unreasonable Search**
*42 U.S.C. § 1983, Fourth and Fourteenth Amendments to the U.S. Constitution*
(Robert Ferguson and Joshua Studor, individually w/ respect to monetary damages and in their official capacities
w/ respect to injunctive relief)

14        60.     The foregoing paragraphs are incorporated herein as if set forth in full.

15        61.     A CID or other administrative subpoena is an unreasonable search in violation

16   of the Fourth Amendment when it seeks private information that is not reasonably relevant to

17   a valid investigation. *See State v. Miles*, 160 Wn. 2d 236, 254, 156 P.3d 864, 873 (2007)

18   (citing *Steele v. State ex rel. Gorton*, 85 Wn.2d 585, 594, 537 P.2d 782, 788 (1975)). A higher

19   standard of suspicion and relevance is required when such subpoenas are directed at

20   individuals' private information rather than the books of corporations, and the standard is

21   higher still when those individuals are family members or acquaintances not directly involved

22   in the corporate target of a valid investigation. *F.D.I.C. v. Garner*, 126 F.3d 1138, 1143 (9th

23   Cir. 1997) (citing *In re McVane*, 44 F.3d 1127 (2d Cir.1995)).

24

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 29

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

62.     Further, a CID or administrative subpoena violates the Fourth Amendment when the issuing agency has exceeded its statutory authority in issuing it.  *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).  Washington law authorizes the Attorney General to issue a CID only in furtherance of an investigation based on suspicion of specific types of unlawful conduct.  *See* RCW 19.86.110(1) (authorizing a CID only when the Attorney General believes the sought information is relevant to an investigation of a possible violation of specific enumerated statutes); RCW 19.86.110(2)(a) (requiring the CID to list the statute that the Attorney General believes may have been violated).  A CID issued without any cause to believe a violation of any of the enumerated statutes has taken place necessarily exceeds the Attorney General's statutory authority to issue CIDs, and it thus also violates the Fourth Amendment.

63.     42 U.S.C. § 1983 allows the plaintiffs to bring a private cause of action for violation of their rights under the Fourth and Fourteenth Amendments.

64.     Because Defendants' investigation is purely retaliatory and not motivated by any reasonable suspicion of wrongdoing, there is no valid investigation to which the information sought by their CIDs could be relevant. It is an aimless fishing excursion, conducted without a clear objective other than harassment and finding something—anything at all—to justify further legal action against Mr. Gottlieb, SAF, and related parties. And because the CIDs were not issued in connection with a valid investigation of possible violations of the statutes enumerated in RCW 19.86.110(1), they exceed State Defendants' statutory authority to issue such demands.   These actions thus constitute unreasonable searches in violation of the Fourth Amendment.

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Count IV**
**Abuse of Process**
*Washington Common Law Tort*
(Robert Ferguson and Joshua Studor, individually w/ respect to monetary damages and in their official capacities
w/ respect to injunctive relief, and the Washington Attorney General's Office)

65.     The foregoing paragraphs are incorporated herein as if set forth in full.

66.     Washington law also recognizes the tort of abuse of process, which is committed when "an ulterior purpose to accomplish an object not within the proper scope of the process" that leads a party to commit "an act not proper in the regular prosecution of proceedings." *Bellevue Farm Owners Ass'n v. Stevens*, 198 Wash. App. 464, 477, 394 P.3d 1018, 1024 (2017) (citing Restatement (Second) of Torts § 682).

67.     Washington has waived sovereign immunity to tort actions, and state officials are liable for tortious conduct to the same extent as private individuals. RCW 4.92.090. It has also made public agencies liable for the tortious conduct of their officials. RCW 4.24.470.

68.     Defendants' investigation of Mr. Gottlieb, SAF, and the other CID recipients is motivated by the ulterior purpose of harassing them for their political beliefs and generating dirt on Mr. Ferguson's political opponents. Mr. Gottlieb is a vulnerable target. A 76-year old man with a history of cardiac arrest. CPD's treatment of Mr. Gottlieb is designed to destroy his health, make his and his family's lives miserable, and to chill the activities of SAF and the other entities or force them out of business as punishment for their politics and opposition to Mr. Ferguson and his agenda. Defendants likewise hope to find reason for a public prosecution that will allow them to garner favor from their supporters, who share their animus toward Mr. Gottlieb, SAF, and the other CID recipients. These purposes are not properly within the scope of the statute authorizing CIDs. Defendants' misuse of CIDs thus constitutes tortious abuse of process.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 31

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

2

**Count V**
**Public Records Act Violation**
*RCW 42.56.550*
(The Washington Attorney General's Office)

3

69.    The foregoing paragraphs are incorporated herein as if set forth in full.

4

5

70.    "The PRA mandates broad public disclosure." *Sargent v. Seattle Police Dep't*,
179 Wash.2d 376, 385, 314 P.3d 1093 (2013) (citing RCW 42.56.030); *Hearst Corp. v.*

6

7

*Hoppe*, 90 Wash.2d 123, 127, 580 P.2d 246 (1978). The law's policy statement proclaims that
"[t]he people of this state do not yield their sovereignty to the agencies that serve them. The

8

9

people, in delegating authority, do not give their public servants the right to decide what is
good for the people to know and what is not good for them to know." RCW 42.56.030. The

10

11

PRA disclosure requirement is thus "liberally construed and its exemptions narrowly
construed to promote this public policy and to assure that the public interest will be fully

12

13

protected. In the event of conflict between the provisions of this chapter and any other act, the
provisions of this chapter shall govern." *Id.*

14

15

71.    State and local agencies are required to disclose their records upon request,
unless the record falls within an exception. *Gendler v. Batiste*, 174 Wash.2d 244, 251, 274

16

17

P.3d 346 (2012) (citing RCW 42.56.070(1)). When a record falls within an exception to the
PRA, the agency must, if possible, provide a redacted document that specifies which

18

19

exceptions purportedly authorize each redaction. *Resident Action Council v. Seattle Hous.*
*Auth.*, 177 Wn.2d 417, 433, 327 P.3d 600, 606 (2013), as amended on denial of reh'g (Jan. 10,

20

21

2014). When a document cannot be effectively redacted to render it non-exempt, the agency
must provide notice that it is withholding the document that includes an explanation of which

22

23

PRA exemption it believes entitles it to withhold the record and why it applies. *Id.* at 432.
"The Public Records Act clearly and emphatically prohibits silent withholding by agencies of

24

25

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 32

records relevant to a public records request." *Progressive Animal Welfare Soc. v. Univ. of Washington*, 125 Wn.2d 243, 270, 884 P.2d 592, 607 (1994).

72.     As detailed above, counsel for SAF and Mr. Gottlieb made a PRA request to Mr. Ferguson's office on August 8, 2022, asking that the agency produce various records related to SAF and related entities and CPD's investigation thereof. Despite the passage of over a year, the State is still withholding and delaying productions and has not even said when its document production will be complete.

73.     On January 12, 2023, during the deposition of Mr. Gottlieb pursuant to one of the CIDs CPD issued to him, Mr. Studor utilized a 1999 email it had pulled from its files as an exhibit. This document was plainly responsive to several parts of the PRA request for. Yet Mr. Ferguson's office did not include this document in any of its prior productions or in any production since. Nor has the agency ever stated that it was withholding this document pursuant to a PRA exemption.

74.     Both the nondisclosure of this document and its use during Mr. Gottlieb's deposition are independent violations of the PRA. *See* RCW 42.56.070(1) (requiring disclosure of public records); RCW 42.56.080(6) ("A public record may be relied on, used, or cited as precedent by an agency against a party other than an agency and it may be invoked by the agency for any other purpose only if: (a) It has been indexed in an index available to the public; or (b) Parties affected have timely notice (actual or constructive) of the terms thereof."). And, to the extent Mr. Ferguson's Office declined to disclose this record because it was requested by counsel for Mr. Gottlieb, SAF, and related entities, this, too, is a PRA violation. *See* RCW 42.56.080(2) ("Agencies shall not distinguish among persons requesting records"). The existence of this wrongfully withheld document also suggests more may exist, constituting yet more PRA violations.

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 33

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

75.     Because the PRA request specifically asked for documents related to CPD's investigation of SAF, it strains credulity to believe the personnel responding to it did not consult with Mr. Studor and his team regarding the documents they intended to use in their investigation, and their failure to do so would at minimum constitute a violation of the office's PRA duty to perform a reasonable search for responsive documents. *See Neighborhood All. of Spokane Cnty. v. Spokane Cnty.*, 172 Wn.2d 702, 720, 261 P.3d 119, 128 (2011). The inescapable conclusion is that Mr. Ferguson's office willfully refused to comply with its PRA obligations. This willful violation justifies imposing the maximum penalties authorized under the statute. *Zink v. City of Mesa*, 162 Wn. App. 688, 712, 256 P.3d 384, 397 (2011).

76.     The Attorney General's Office has violated RCW 42.56.520 by filing to provide its response to SAF's request for public records promptly and by failing, within five business days of receiving SAF's request to respond by (a) providing the responsive records, (b) provide a link to the records, (c) providing a reasonable estimate of the time the office will require to respond to the request, (d) asking for clarification of the request and providing a reasonable estimate of the time required to respond, or (e) giving SAF specific reasons why it is denying SAF's request.

## I.         PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants, as follows:

      a.  Declare that Defendant's politically motivated harassment, including its serving CIDs on Plaintiffs and related parties, violates the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

      b.  Enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from serving

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 34

or enforcing further CIDs for politically discriminatory or retaliatory purposes and/or without reasonable suspicion of illegal activity;

c.  Order Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them to return or destroy all nonpublic documents or other digital or tangible memorializations of private information that are in their possession as a result of their serving and enforcing CIDs on Plaintiffs and related parties for politically discriminatory or retaliatory purposes and/or without reasonable suspicion of illegal activity;

d.  Grant Plaintiffs any and all damages to which they are entitled, including but not limited to actual, compensatory, punitive and/or nominal damages;

e.  Pursuant to 42 U.S.C. § 1983 and 1988, RCW 19.86, and any other applicable law, award the Plaintiffs their costs, attorneys' fees, and expenses to the extent permitted;

f.  Award Plaintiffs their costs, including reasonable attorney fees, incurred in connection with this action, as well as $100 dollars per day that they were denied access to the public records they have requested, under RCW 49.56.550; and

g.  Grant any and all other equitable and/or legal remedies as this Court may see fit.

DATED this 18th day of September, 2023.

CORR CRONIN LLP

 s/ Jack M. Lovejoy
Steven W. Fogg, WSBA No. 23528
Jack M. Lovejoy, WSBA No. 36962
1015 Second Avenue, Floor 10
Seattle, WA 98104
(206) 625-8600 Phone
sfogg@corrcronin.com
jlovejoy@corrcronin.com

*Attorneys for Plaintiffs*

CIVIL RIGHTS COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF – 35